# EXHIBIT "A"

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>Unisys Corporation, Maureen Sweeny, and Does 1-50<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>Paul J. Gallagher | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**05/05/2022** at 07:47:20 PM<br>Clerk of the Superior Court<br>By Veronica Navarro,Deputy Clerk |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Diego Superior Court, North County Division<br>325 South Melrose Drive, Vista, CA 92081 | CASE NUMBER:<br>*(Nú* 37-2022-00017344-CU-WT-NC |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Tiffany P. Scarborough, Scarborough Law, 41856 Ivy Street, Ste. 108, Murrieta, CA 92562, 951-290-2662

| DATE: 05/09/2022 | Clerk, by | *V. Navarro* | , Deputy |
|---|---|---|---|
| *(Fecha)* | *(Secretario)* | V. Navarro | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

   ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov

TIFFANY P. SCARBOROUGH (SBN 180981)
SCARBOROUGH LAW
41856 Ivy Street, Suite 108
Murrieta, CA 92562
Telephone: (951) 290-2662
Email: tiffany@tpscarborough.com

Attorney for Plaintiff Paul J. Gallagher

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**05/05/2022** at 07:47:20 PM
Clerk of the Superior Court
By Veronica Navarro,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO – NORTH COUNTY DIVISION

PAUL J. GALLAGHER, an individual,

Plaintiff,

v.

UNYSIS CORPORATION, a Delaware Corporation; MAUREEN SWEENY, an Individual, and DOES 1 - 50, inclusive, Defendants.

CASE NO.: 37-2022-00017344-CU-WT-NC

**COMPLAINT**

## GENERAL ALLEGATIONS

1.     Plaintiff PAUL GALLAGHER ("Gallagher") is an individual who resides in the City of Oceanside in North San Diego County, California. He was employed by Defendant UNISYS CORPORATION until December 31, 2021.

2.     Defendant UNISYS CORPORATION ("Unisys") is a California registered foreign corporation incorporated in Delaware, with its principal place of business in Pennsylvania. It has several offices in California, including in Irvine, CA, Ontario, CA and Santa Clara, CA. Unisys regularly and routinely resides in, does business in, and employs individuals in California.

3.     MAUREEN SWEENY ("Sweeny") is an individual who, on information and belief, resides in and is employed in Texas. She is a Senior Vice President and the Chief

Revenue Officer for Unisys. As part of her job duties, she conducts business in and supervises employees in California.

4.     The true names and capacities, whether individual, corporate, associate, or otherwise of Defendant sued herein under Section 474 of the Code of Civil Procedure as DOES 1 through 50 are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff will seek leave of Court to amend its pleadings to set forth the true names and capacities of such fictitiously named defendants when their identities become known to Plaintiff.

5.     Plaintiff is informed and believes, and based upon such information and belief alleges, that each of the fictitiously named Defendants are responsible in some manner for the events and happenings herein referred to, and proximately caused or were a substantial factor in causing the conditions herein alleged.

6.     Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned, each of the Defendants, and all of them, are and/or were the agent, servant, representative and employee of each of the remaining Defendants, and was acting within the scope and purpose of such agency, service and/or employment.

7.     The events set forth herein occurred in San Diego County, California. Gallagher was hired and performed his employment duties in San Diego County California. The obligation to pay wages to Gallagher and all related breaches or violations of California's employment laws occurred in San Diego County, California. Venue in the San Diego County Superior Court is appropriate pursuant to California Code of Civil Procedure section 395.5.

## FACTUAL ALLEGATIONS

8.     On or around August 10, 2020, Gallagher began his employment at Unisys. He was hired as an hourly employee in a "Sales Executive 1" position. He worked from his home in Oceanside, in San Diego County, California. Gallagher was not an "outside salesperson" as defined in the *California Labor Code* and was not an exempt employee.

9.      As part of his compensation, Gallagher received an annual base salary and was eligible for commissions and bonuses on sales transactions, pursuant to the Sales Executive Compensation Plan, which has 3 separate parts. The Sales Executive Compensation Plan is not negotiable. It was provided to Gallagher after he became employed at Unisys and is a condition of employment and receiving commission, i.e., take it or leave it. The offer letter that Gallagher received stated: "In addition to your salary, you will be eligible to participate in the 2020 Sales Executive Compensation Plan. You will be provided with a copy of the plan *after* you begin your employment with Unisys." (*Ital.* added) The 2021 Sales Executive Compensation Plan, Parts 1 and 2 ("Plan") was provided to Gallagher on or around March 18, 2021, was not negotiable, and outlines how commissions and bonuses could be earned that year. There is a Part 3 to the Plan, which was not provided to Gallagher. A true and correct copy of the Plan is attached hereto as **Exhibit A**. Unisys reserves the right to unilaterally amend/change the Plan at any time after written notice to employees.

10.      Gallagher was assigned annual sales quotas by management.

11.      As an hourly employee, Gallagher was entitled to his hourly wage pay, overtime pay, and rest and meal periods. He was entitled to timely payment of all wages, including earned commissions. In addition, he was entitled to receive accurate paystubs.

12.      While employed at Unisys, Gallagher regularly worked from his home office. Gallagher was not advised that he was entitled to duty free meal or rest breaks in compliance with California law. He never signed an on-duty meal agreement. Unisys did not properly track the time that Gallagher worked. He was instructed to log his time by inputting in the Webtime program that he worked eight (8) hours per day, Monday through Friday, regardless of the actual time worked any particular day. Gallagher's employment records state that he was hourly and that he was not entitled to overtime pay. Gallagher worked long hours, including early mornings, late evenings, and weekends.

13.      As a result of Unisys's time keeping policy and practice, Gallagher did not receive overtime pay for time he worked in excess of eight (8) hours on a particular day or 40

hours in a particular week. He did not receive duty-free meal periods and was not paid meal premium pay for meal breaks that he missed. He did not receive the required duty-free rest breaks and he was not paid any rest premium pay for rest periods that he missed. As a further result, Gallagher's paystubs were not accurate.

14.     In 2021, Unisys assigned Gallagher sales quotas that he was required to meet to be eligible for a commission. Gallagher spent the first half of 2021 working on a large contract for Unisys. His direct supervisor, Steven Pollenz ("Pollenz") and Sweeny were both aware of and gave guidance and input on the contract ("Subject Contract"). In July 2021, Unisys conservatively valued the Subject Contract at $75 million, however, it was believed to be worth over $100 million. The Subject Contract exceeded Gallagher's annual sales quota.

15.     Gallagher worked on the Subject Contract for between 6-7 months. In July 2021, Gallagher was instructed by Sweeny, both personally and through Pollenz, to get the Subject Contract finalized before the 2nd Quarter investor call ("Q2 Call") so that it could be announced on the Q2 Call. When Gallagher expressed concern that signing was premature, Sweeny directed him to close the deal. Sweeny made comments to Pollenz and Gallagher that she would "take care of him" or that she would "do the right thing" and other similar statements, but to "get it done".

16.     The Subject Contract was approved by the legal department on July 27, 2021, signed by Sweeny on July 28, 2021, and sent to the client to countersign.

17.     On August 2, 2021, Unisys stated on a call with Wall Street that backlog increased by approximately $100 million due to a delay in the signing of one large new DWS contract, which had since been signed.  Pollenz sent Gallagher a text with a picture of a slide, implying to Gallagher that the reference was to the Subject Contract hat he had closed that week.  The Subject Contract was mentioned several times on the Q2 Call on August 3, 2021, including that the value was between $50 million and $100 million.

18.     After the contract was signed, Gallagher worked with Pollenz to submit the appropriate paperwork to the Compensation Committee in order to receive his commission. On

information and belief, Unisys policy and the Plan require that all sales deals are submitted to the Compensation Committee for purposes of establishing commissions.

19.     In or around August 2021, Pollenz informed Gallagher that he would be no commission on the Subject Contract and that it would not be considered by the Compensation Committee. Gallagher questioned Pollenz about this on different occasions. Unisys now takes the position that the Subject Contract did not have a stated value and therefore he is not entitled to a commission. This is contrary to statements previously made to Gallagher, including by Pollenz and financing director David Ford. It is contrary to the Revenue Recognition, TCV, and Backlog Policy subsequently provided to Gallagher by Unisys. It is also contrary to Sweeny's prior statements to Gallagher and Pollenz when she demanded that the Subject Contract be finalized - a deal she calls a "key win" for Unisys. Pollenz told Gallagher that he was not a "team player" and was being "threatening" for asking about his compensation.

20.     Gallagher attempted to meet with Sweeny about the commission. On or around September 2, 2021, Sweeny's assistant scheduled a meeting for the next day. Later that day, Sweeny's assistant cancelled the meeting and instructed him to discuss the matter with Pollenz. Sweeny thereafter refused to speak with Gallagher.

21.     On September 2, 2021, Gallagher also requested permission from Pollenz to attend a local networking event in support of a new sales opportunity.  Pollenz advised that "at this current juncture", he would not give the requested permission. The next day, Gallagher again asked about the commission on the Subject Contract and was again told he was not being a "team player". He was told to focus on new deals but was denied the ability to attend the networking event that could bring in a new deal. Pollenz stopped communicating with Gallagher.

22.     On or around September 13, 2021, Gallagher learned that Pollenz flew from Boston to Los Angeles to attend the networking event that he had denied permission of Gallagher to attend.  Gallagher reached out to Pollenz and requested a dinner meeting in an

effort to show that he was a "team player". Gallagher left the meeting with the understanding that it went well, that everyone was on the same page and that everything was fine.

23.    Thereafter and through September, Gallagher and others continued to work with the customer who signed the Subject Contract. Gallagher again asked about the commission. On September 28, 2021, Gallagher was instructed to turn over a potential deal that he had been working on since July.

24.    On or around October 7, 2021, Gallagher had a performance call with Pollenz to discuss a Personal Improvement Plan ("PIP"). He was told he needed to show progress in the fourth quarter based on a PIP, which was a surprise to Gallagher.

25.    That same day, there was a complaint by the client that Gallagher had attempted to meet with at the Los Angeles networking event that Pollenz had denied, complaining at the lack of response to inquiries made on the Unisys's website for assistance. Gallagher was not privy to the website inquiries, which he believes would have been avoided had he been able to meet with the client as requested at the networking event; an opportunity denied by his employer making it impossible to perform. Gallagher was asked by Pollenz to take the lead with the client. Two days later, he was told by Sweeny's Business Development Department to "cease and desist" working with the client. Pollenz told him to remain engaged.

26.    On information and belief, Sweeny changed the terms of the Plan informally, with no changes made in writing. As a result, sales leads were being taken away from sales executives, including Gallagher, and reassigned to the business development staff.

27.    On or around October 18, 2021, Gallagher sought assistance from the Human Resources Vice President for Enterprise Solutions, who had been involved in his hiring process. She referred him to a different Senior Human Resources Manager, who was out of the office. She also told him to consider escalating to the Compliance Help Line Home - Unisys Ethics (sharepoint.com).

28.    One day after reaching out to Human Resources, the account for which Gallagher had procured the lead, attempted to meet with the client at the networking event he

1    was prohibited from attending, was asked to take the lead on, then to cease and desist, but then

2    told to remain on by Pollenz was taken from him and permanently and reassigned to another

3    employee, despite Gallagher having procured the client.

4         29.    On October 22, 2021, Gallagher received an email that there was a PIP in his

5    file. No one discussed the specifics of the PIP with him.

6         30.    On October 23, 2021, Gallagher was advised by Human Resources to file a

7    formal complaint. On October 25, 2021, Gallagher filed an official compliant online, via the

8    Unisys website. He was contacted by Chad M. Jespersen, Privacy Lead, HR ("Jesperson") to

9    discuss his concerns with respect to being put on a PIP and told that he was a bad performer

10   after asking about his compensation for procuring and closing the Subject Contract.

11   Gallagher's claim was then assigned to Dianna Smith, HR Business Partner, Chief Revenue

12   Office ("Smith"), i.e., she worked for Sweeny. On November 2, 2021, Gallagher asked to

13   speak with Jesperson again, given his concern that Smith reported to Sweeny.

14        31.    In November 2021, Unisys received its first work order under the three (3) year

15   Subject Contract, for over $2,113,834.00.

16        32.     On December 6, 2021, Gallagher attended a Sales Account planning call with

17   Sweeny and all Senior Sales Executives. He was treated differently by Sweeny than other

18   attendees/presenters. Following that meeting, he had a telephone call with Pollenz in which

19   Gallagher was informed he was being terminated from Unisys. The PIP discussion that he was

20   supposed to have with Pollenz, and which never occurred, was postponed.

21        33.    In a December 7, 2021, Smith sent Gallagher an email advising him not to

22   submit a dispute claim for the commission on the Subject Contract, as set forth in the Plan. She

23   advised that he should submit a sales credit claim through the Unisys system. The email also

24   states that Gallagher would receive his final paycheck 8 days late.

25        34.    On December 8, 2021, Smith told Gallagher that his last official day of work

26   would be December 17, 2021, and that his employment at Unisys would terminate on

27   December 31, 2021. On December 9, 2021, Smith discussed the severance documents with

28

1   Gallagher and provided false information to him, in an effort to coax him into signing a

2   Severance Agreement, by which he would waive all claims against Unisys. During this time

3   frame, Smith also acknowledged that Sweeny admitted to her that she made the comments that

4   she would "do the right thing" and "take care of Gallagher" when demanding that he just "get

5   it [the Subject Contract] done", but that Sweeny claimed to mean something else.

6        35.     The Plan states that an employee must remain an employee of Unisys to receive

7   the commissions they have otherwise earned.

8        36.     On December 16, 2021, Sweeny had a Unisys "Town Hall" meeting during

9   which she outlined the 2021 "Key Wins" for Unisys. One of those "key wins" was the deal that

10  had been procured and finalized by Gallagher. The presentation material showed the value of

11  the contract at $75 million. At the same time, and on an ongoing basis, Unisys has taken the

12  position to Gallagher that the contract has no value, despite announcing it repeatedly as having

13  a $75 million or more value, referring to it is a "key win", and having collected money on the

14  contract for work orders placed to date and penalizing him for alleged poor performance.

15       37.     Gallagher was not paid his final wages at the time of termination or within

16  seventy-two (72) hours. Final hourly wages were paid on January 7, 2022. However,

17  Gallagher's commission on the over $2 million order on the Subject Contract, was not paid

18  until March 2022. Unisys has taken the position that the Subject Contract has no value, and the

19  Gallagher is not entitled to commissions while belatedly paying Gallagher a partial

20  commission.

21       38.     On information and belief, Unisys has and will continue to receive the benefit of

22  the Subject Contract for three (3) years, including millions of dollars paid and/or payable to

23  Unisys under the Subject Contract.

24       39.     Gallagher performed under the Plan. He procured the business and finalized the

25  deal that was the $75 million "key win", i.e., he was the person responsible for obtaining the

26  Subject Contract. His only continued performance requirement was to maintain his

27  employment in order to receive the earned commissions. Unisys prevented his performance by

28

---

**COMPLAINT**

8

implementing a sham PIP, making it impossible for him to finalize any further deals or comply with the terms of the sham PIP, and improperly terminating Gallagher

## FIRST CAUSE OF ACTION

### (Retaliation – Labor Code § 98.6 and Public Policy)

40.    The allegations set forth in Paragraphs 1-39 are incorporated by reference, as if fully set forth herein.

41.    Gallagher engaged in protected activity when he attempted to obtain payment of a commission he had earned, i.e., a wage, to have Unisys comply with its own corporate policy and Plan, and to have the issue reviewed by the company's Compensation Committee pursuant to the Plan.

42.    Unisys subjected Gallagher to an adverse employment action by determining that he was not a "team player" because of his ongoing inquiries, by taking away is ability to participate in other sales and marketing events, by putting him on a PIP for unsatisfactory performance and then making it impossible for him to meet the PIP terms, and by terminating him.

43.    There is a causal link between Gallagher's ongoing inquiry for payment of an earned wage and the PIP, refusal to allow Gallagher to participate in sales and marketing events depriving him of sales opportunities he had been working on, making it impossible for him to comply with the PIP, and his termination.

44.    As a result of the PIP, lost opportunities, and termination, Gallagher has been harmed in the amount of the lost commission on the Subject Contract, lost base wages, and other lost commissions on prospective deals he was working on when he was put on the PIP, not allowed to attend an important sales and marketing event, not allowed to pursue other clients he had procured, and ultimately terminated.

45.    In addition, Unisys terminated Gallagher after he procured the Subject Contract to avoid paying substantial commissions to him and to keep all proceeds from the Subject Contract for itself. After terminating the employment relationship, before Gallagher's last day

at Unisys, Gallagher was invited to a company Town Hall meeting held by Sweeny, in which the Subject Contract was listed as a $75 million "key win" for Gallagher.

46.     As a result of Unisys's actions, Gallagher has suffered emotional distress, including stress, anxiety, humiliation, lost sleep, and headaches.

47.     Gallagher seeks damages for the retaliation and emotional distress in an amount of at least $750,000.

48.     Unisys's conduct was the result of malice, oppression, and/or fraud. Gallagher seeks punitive damages against Unisys for the retaliation and improper termination.

49.     Unisys's conduct of retaliation is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

SECOND CAUSE OF ACTION

(Breach of Contract)

50.     The allegation set forth in Paragraphs 1-49 are incorporated by reference, as if fully set forth herein.

51.     *After* Gallagher was hired, he was provided with a one-sided adhesion contract setting forth the manner in which he would be eligible for a commission at Unisys. The contract was not negotiable and was "take it or leave it". In 2021, Gallagher received a revised commission agreement, the Plan. He was required to accept the Plan to be eligible to receive a commission. The Plan was not negotiable and was a condition of continued employment.

52.     Gallagher performed under the Plan, securing the very lucrative three (3) year Subject Contract for Unisys. After instructing him to secure the Subject Contract by the Q2 Call and announcing the Subject Contract on the Q2 Call, Unisys took the position that the Subject Contract had no value and thus did not qualify for a commission. Gallagher was put on a sham PIP. Shortly thereafter, the first work order came in under the Subject Contract. Unisys still took the position that the Subject Contract had no value. Gallagher was thereafter terminated due to alleged "unsatisfactory performance".

53.     Gallagher procured the Subject Contract on behalf of Unisys. There was nothing left for him to do to perform except remain employed at Unisys to receive the commission. By terminating Gallagher's employment, Unisys prevented Gallagher from fulfilling the only remaining condition precedent to getting the commission set forth in the Plan - remaining employed at Unisys.

54.     Gallagher seeks damages in the amount of the lost commission in an amount subject to proof, but no less than $371,050. Gallagher also seeks prejudgment interest on the earned commissions.

55.     In addition, Gallagher procured other clients for Unisys that were ultimately taken from him. If any deals were finalized with regard to those other clients, it was done by persons who did not procure the clients0, and were given the clients procured by Gallagher. Because he procured those clients, Gallagher is entitled to commissions on contracts resulting from his efforts in an amount according to proof, as well as prejudgment interest.

56.     Unisys's conduct was the result of malice, oppression, and/or fraud. Gallagher seeks punitive damages against Unisys for the retaliation and improper termination.

57.     Unisys's conduct of retaliation is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

THIRD CAUSE OF ACTION

(Failure to Pay Wages in a Timely Manner)

58.     The allegations set forth in Paragraphs 1-57 are incorporated by reference, as if fully set forth herein.

59.     On the date Gallagher's employment was terminated on December 31, 2021, Gallagher was not paid all wages to which he was entitled. Gallagher was not paid his final base salary wages for eight (8) days after his last day of employment at Unisys.

60.     Per Unisys's admission, Gallagher earned a commission of $10,556.38 in November 2021. The commission amount was easily calculated on the termination date. However, Defendants willfully failed to pay Gallagher the earned commission until

---

**COMPLAINT**

11

approximately March 4, 2022. As a result, Gallagher is entitled to a daily penalty at the regular rate of pay for up to 30 days in the amount of $29,508.00. (Cal. Lab. Code § 302(a))

61.     The failure to pay the owed wage in a timely manner was malicious and oppressive. Gallagher seeks punitive damages as a result of Defendants' conduct.

62.     The failure to pay the owed wage in a timely manner is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq.*

FOURTH CAUSE OF ACTION

(Failure to Pay Wages)

63.     The allegations set forth in Paragraphs 1-62 are incorporated by reference, as if fully set forth herein.

64.     An earned commission is a wage. (Lab. Code, § 200 (a))

65.     Gallagher earned a commission for procuring and finalizing the Subject Contract. Unisys claims that the subject contract has no value for purposes of paying Gallagher his earned wage. Unisys simultaneously claims that the Subject Contract is, at a minimum, a $75 million "key win" for purposes of promoting Sweeny's work and Unisys's stock value.

66.     Unisys has failed and refused to follow its company policy and the Plan and has failed to pay Gallagher wages in an amount according to proof, but in no event less than $371,050, plus all penalties, liquidated damages, and prejudgment interest.

67.     In addition, if any other deals were finalized based on clients procured by and taken from Gallagher making it impossible to perform, he is owed wages of unpaid wages on commissions earned, plus all penalties, liquidated damages, and prejudgment interest.

68.     The failure to be paid wages has caused Gallagher to suffer emotional distress, including but not limited to stress, anxiety, humiliation, headaches and loss of sleep, for which he is entitled to damages.

69.     The failure to pay the owed wage was malicious and oppressive. Gallagher seeks punitive damages as a result of Defendants' conduct.

70.     The failure to pay the owed wage is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

FIFTH CAUSE OF ACTION

(Failure to Pay Overtime)

71.     The allegations set forth in Paragraphs 1-71 are incorporated by reference, as if fully set forth herein.

72.     Gallagher was an hourly employee, paid an annual salary that calculates to $84.14 per hour. He was not an exempt employee, however Unisys mischaracterized him as an exempt employee. Gallagher was instructed to track his time by stating that he worked eight (8) hours per day each week day. Unisys did not have a policy or mechanism to accurately track Gallagher's time. Gallagher frequently worked overtime. He frequently worked over eight (8) hours in a day and over forty (40) hours per week, including early morning calls, late night calls and weekend calls. This was particularly true during the 6-7 months that Gallagher was negotiating the Subject Contract.

73.     Gallagher has never been compensated for any of the overtime that he worked. California employees are entitled to overtime pay for any day in which they worked over eight (8) hours and any week in which they worked over forty (40) hours. (Cal. Lab. Code § 510) In addition, for each 7 days straight per week that an employee works, they are entitled to overtime pay for the entire seventh day. Because Unisys failed to keep track of the time as required, Gallagher can only estimate that between February and July 2021, he worked an average of 2 overtime hours per day during the week and 2 hours per day on weekends. There were other periods in which Gallagher worked overtime for which he was not paid, that were not during the time he was working on the Subject Contract.

74.     Overtime is calculated at the regular rate of pay. Gallagher seeks overtime wages in an amount according to proof, but at a minimum in the amount of $50,000.

75.     In addition, Gallagher is entitled to and seeks all penalties and liquidated damages owed to him under the law for unpaid overtime, as well as prejudgment interest.

76.     The failure and refusal to accurately track time and pay overtime wages is fraudulent, malicious and oppressive. Gallagher seeks punitive damages against Unisys for this improper conduct.

77.     The failure to pay owed overtime is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

SIXTH CAUSE OF ACTION

(Meal and Rest Time Violations)

78.     The allegations set forth in Paragraphs 1-77 are incorporated by reference, as if fully set forth herein.

79.     Gallagher was an hourly employee, paid an annual salary that calculates to $84.14 per hour. He was not an exempt employee, however Unisys mischaracterized him as such. Unisys never advised Gallagher of his right to take an uninterrupted lunch break or uninterrupted rest breaks during each eight (8) hour or longer shift.

80.     Unisys does not have a meal or rest time policy requiring that employees take mandated meal or rest breaks. Gallagher did not receive his required, uninterrupted rest or meal breaks during his employment at Unisys and was deprived of the same given the lack of company policy and mischaracterization of him as an exempt employee.

81.     Gallagher is entitled to meal premium pay for each shift that he worked for which he did not receive an off-duty meal break. Gallagher worked 304 days on which he did not receive a required, duty-free meal break, resulting in meal break premium pay owed to him in the amount of $29,758.94.

82.     Gallagher is entitled to rest period premium pay for each shift that he worked for which he did not receive at least one of the two off-duty rest breaks he was entitled to receive. Gallagher worked 304 days on which he did not receive at least one required off-duty rest break, resulting in meal break premium pay owed to him in the amount of $29,758.94.

83.     Gallagher is entitled to interest on the unpaid meal and rest premium pay.

84.     The failure and refusal to provide meal and rest breaks and failure to pay premium pay is fraudulent, malicious and oppressive. Gallagher seeks punitive damages against Unisys for this improper conduct.

85.     The failure to provide meal and rest breaks is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq.*

SEVENTH CAUSE OF ACTION

(Fraud)

86.     The allegations set forth in Paragraphs 1-85 are incorporated by reference, as if fully set forth herein.

87.     Sweeny specifically instructed Gallagher to "close the deal" that became the Subject Contract before the Q2 Call. Sweeny told Gallagher and Pollenz that she would make sure he was "taken care of" and "do the right thing" by him, and other similar statements.

88.     Sweeny intended for Gallagher to rely on her statements and Gallagher justifiably relied on Sweeny's statements. He finalized the Subject Contract prior to the Q2 Call as instructed. Sweeny got the outcome she was seeking, and the Subject Contract was announced on the Q2 Call. It was also announced as a "key win" for Unisys.

89.     Sweeny never intended to "take care of" or "do the right thing" by Gallagher as she stated. Sweeny has admitted making the comments but has subsequently taken the position that she meant something else.

90.     Unisys was aware of Sweeny's false statements and Gallagher's reliance on them and has ratified Sweeny's conduct. Unisys takes the position that Sweeny's statements meant only that she intended to follow the Plan.

91.     Furthermore, Sweeny and Unisys were responsible for putting Gallagher on a sham PIP for unsatisfactory performance while announcing the deal in two separate company meetings, one of which the Subject Contract was announced as a "key win" for Unisys. The Subject Contract was also announced on the Q2 Call to influence investors and manipulate the stock price.

92.     As a result of Gallagher and Unisys's false statements and conduct, Gallagher has suffered emotional distress, including but not limited to stress, anxiety, humiliation, headaches, and loss of sleep.

93.     Gallagher seeks damages according to proof, but in an amount no less than $750,000 and any prejudgment interest to which he is entitled.

94.     This conduct is fraudulent, malicious and oppressive. Gallagher seeks punitive damages against Unisys for this improper conduct.

95.     This fraudulent conduct is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

EIGHTH CAUSE OF ACTION

(Inaccurate Wage Statements)

96.     The allegations set forth in Paragraphs 1-95 are incorporated by reference, as if fully set forth herein.

97.     Gallagher was paid every two (2) weeks, wherein Defendants would insufficiently compensate him. During each pay period, Defendants failed to provide Gallagher with an itemized statement of wages that accurately stated the total hours worked by him. During each pay period, Defendants failed to provide Gallagher with an itemized statement that accurately states the total and actual net wages earned by him, in that each statement omitted overtime he had earned.

98.     During each pay period mentioned herein, Defendants failed to provide Gallagher with an itemized statement that accurately states the gross wages earned by him.

99.     During each pay period mentioned herein, Defendants failed to accurately pay or reflect the meal and rest period premium pay owed to Gallagher.

100.     As a result of Defendants' failure, outlined herein, Gallagher is entitled to penalties under *California Labor Code* § 226.3 in the amount of $4,000.

101.     This conduct constitutes an unfair business practice pursuant to is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

NINTH CAUSE OF ACTION

(Managing Agent Liability – Lab. Code §§558.1, 1197.1)

102.   The allegations set forth in Paragraphs 1-101 are incorporated by reference, as if fully set forth herein.

103.   Sweeny was the managing agent of Gallagher. She is the Chief Revenue Officer and directed Gallagher as it related to the Subject Contract. Sweeny determined that Gallagher should not be paid any commission on the Subject Contract, in concert with others, including unknown DOE defendants who will be named upon discovery of their identity.

104.   Sweeny and possibly other DOE Defendants are personally liable under the above causes of action as Plaintiff's immediate supervisor(s) and managing agent(s).

105.   Sweeny and other DOE Defendants are employers as defined by the California Labor Code and are therefore personally and individually liable for failure to pay Gallagher earned wages and overtime wages, penalties, liquidated damages, and any other applicable penalties. (Lab. Code § 558.1)

106.   Sweeny and other DOE Defendants are personally liable for each cause of action pursuant to *California Labor Code* § 1197.1, which establishes individual liability for any wages, liquidated damages, and any applicable penalties imposed pursuant to *California Labor Code* § 203.

107.   Gallagher is entitled to his wages, liquidated damages, and any applicable penalties imposed pursuant to *California Labor Code* § 203 and recovered. (See *California Labor Code* §1197.l(a)(3)).

108.   The conduct described in this cause of action constitutes an unfair business practice pursuant to *California Business and Professions* Code §§ 17200 *et. seq.*

TENTH CAUSE OF ACTION

(Negligence)

109.   The allegations set forth in Paragraphs 1-108 are incorporated by reference, as if fully set forth herein.

110.     Defendants owed a duty of care to Gallagher. Defendants breached their duty of care. Breaches of Defendants' duties of care include, but are not limited to, failing to comply with their own policies, failing to comply with the California Labor Code, failing to pay wages and overtime earned by Gallagher, inducing him to rely on false statements, and improperly terminating his employment.

111.     Gallagher was harmed as a result of Defendants' conduct including loss of his employment, non-payment of wages and overtime, non-payment of premium pay for missed meal and rest breaks, and receiving inaccurate wage statements. Gallagher has suffered emotional distress as a result of Defendants' conduct, including stress, anxiety, humiliation, headaches and loss of sleep.

112.     This conduct is fraudulent, malicious and oppressive. Gallagher seeks punitive damages against Unisys for this improper conduct.

113.     This conduct is an unfair business practice pursuant to California Business and Professions Code § 17200, *et. seq*.

## ELEVENTH CAUSE OF ACTION

(Unfair Business Practices – Bus. & Prof. Code §§ 17200 *et. seq.*)

114.     The allegations set forth in Paragraphs 1-113 are incorporated by reference, as if fully set forth herein.

115.     Defendants' improper retaliation against Gallagher, termination of Gallagher, failure to pay overtime wages, failure to pay wages earned and wages owed, failure to pay meal and rest time premiums and penalties required by all applicable Wage Orders and relevant *California Labor Codes,* further violates the provisions of *Business & Professions Code* § 17200 et. seq., and is unlawful thereby being an unfair business practice.

116.     Gallagher hereby demands restitution under *Business & Professions Code* § 17200 et. seq. Pursuant to *Business & Professions Code* s 17802, Gallagher requests that the Court award him three (3) times the amount of actual damages sustained by Gallagher herein.

PRAYER

Incorporating each paragraph previously set forth herein, and having suffered damages as a result of Defendants' conduct, Gallagher prays for the following relief from Defendants:

1.      Compensatory damages for unlawful termination, breach of contract, unpaid wages, unpaid overtime, fraud, negligence and emotional distress in an amount according to proof, but in no amount less than $1,000,000;

2.      All penalties to which Gallagher is entitled under the *California Labor Code* for meal break premium pay, rest break premium pay, late wage pay, and inaccurate paystubs in an amount according to proof, but in no event less than $93,025.88;

3.      All liquidated damages that Gallagher is entitled to receive under the *California Labor Code* for unpaid wages and unpaid overtime;

4.      Liquidate damages pursuant to *Business & Professions Code* § 17802 in the amount of $3,279,077.64;

5.      Punitive damages in an amount that is reasonable and proportionate to the amount of harm to Gallagher and to the general damages recovered, in a minimum amount of $6,500,000 against Unisys and $500,000 against Sweeny;

6.      Attorney's fees and costs of suit.

7.      Prejudgment interest

8.      Such other relief as the Court deems fair and just.

Date: May 5, 2022                              SCARBOROUGH  LAW



_____
Tiffany P. Scarborough
Attorney for Plaintiffs

---

**COMPLAINT**
19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"



# 2021 Sales Executive Compensation Plan –  Part 1

## OBJECTIVES

The Unisys 2021 Sales Executive Compensation Plan – Part 1 ("Plan") describes the terms of sales incentives at Unisys (the "Company") for the Plan Year.   This plan incents achieving the following strategic objectives:

- Prescriptive focus on selling New Logo opportunities
- Additional focus on growing New Logo pipeline
- Targeted approach for achieving predictable profitable services growth
- Shift of business mix to increase higher margin opportunities and current year revenue
- Provide market competitive total incentive opportunity
- Attract and retain quality Sales Executives to support these strategic objectives

## ELIGIBILITY

To be eligible for sales incentives under the terms of this Plan, a participant must:

- Be in an eligible Sales Executive role to which this Plan has been assigned,
- Have formally accepted you're the Plan and quota/target assignment in Workday for 2021, and
- Be in compliance with Unisys employment policies and the Legal Terms and Provisions – Part 2 of this Plan.
- Hereafter, such individuals will be referred to as Participants.

## PLAN TERM

Plan provisions apply to all eligible transactions credited to the Sales Executive from January 1, 2021 through December 31, 2021, unless otherwise specified. The Company reserves the right to cancel or change the Plan at any time. This Plan supersedes and cancels all other plans, communications or provisions (whether expressed or implied) for incentive compensation issued prior to the stated effective date and does not carry over from one plan year to the next, except as specifically stated within this document.

## INCENTIVE CATEGORY AND WEIGHTINGS

The Participant's total target incentive amount is recorded on his/her Plan Assignment in Workday and is divided between the incentive categories: Total Contract Value and Qualified, Submitted proposals.

Target Incentive will not be revised based on base salary changes during the year.



| Incentive Category | Weighting |
|---|---|
| **Total Contract Value (TCV)** | 80% |
| **Qualified Submitted Proposals** | 20% |

## QUOTA

Leadership will assign Participants an annual TCV quota and a quota for Qualified, Submitted Proposals.  The TCV quota will define the level of expected New Logo sales to be achieved. Quota assignments are based on Leadership's assessment of the opportunities within each Sales Executive's assigned accounts and/or territories. Quota amounts may be changed during the plan year at the sole discretion of Leadership.  The participant's TCV Quota will be used to calculate the personal bonus rate and bonus payments. The quota for qualified, submitted proposals will be assigned to define the number of New Logo opportunities that each Sales Executive is expected to bring forward through DR2 approval and client submissions.

## PERSONAL BONUS RATE AND TARGET BONUS

A personal bonus rate will be calculated for each metric based on the assigned target bonus amount divided by the assigned quota.

## SALES CREDIT AND TCV ACHIEVEMENT BONUS ELIGIBILITY

Sales Credit for the TCV Achievement bonus will be based on the validated financial documentation and client committed:

1. **Total Contract Value (TCV) greater than or equal to $500K USD**
2. **Services Corporate Gross Margin greater than or equal to 20%**
3. **Contracted TCV**
4. **Business Type: New Logo**

## COMMISSION POOL

In addition to TCV attainment credit, for opportunities ≥ $5M USD TCV and Services Corporate Gross Margin ≥ 20%, the Participant is also eligible to participate in the Commission Pool Plan. (see the Commission Pool Plan on the Sales Compensation site within the Go-To-Market Portal or the Global Rewards site).

## SALES CREDIT CLAIM FORM (SCCF)

Sales Executives will need to raise Sales credit Claim Forms in Salesforce to receive sales credit against assigned quotas for TCV and qualified, submitted proposals. Quota credit will be granted based on registered, approved and validated Sales Credit Claim Forms (SCCFs) by GTM Compensation.



### Registering a Sales Credit and TCV Achievement Bonus/Commission Pool request

Sales credit for quota bonus requests are registered by completing the **SCCF** which is available in Salesforce from the opportunity view. The SCCF must receive two levels of approval within Salesforce prior to validation and quota attainment processing.

### To receive credit for a Sales Executive's TCV Quota Bonus

Once the opportunity is won and a fully executed, signed contract is complete, the opportunity record and **SCCF** are updated to reflect final contract value and Services Corporate Gross Margin by Service / Product line. All appropriate pricing documents, e.g. Service Pricing Spreadsheet (SPS), Fact Sheet Model, Oracle Contract Price Quote (CPQ) or (UACT), must be attached to the opportunity record to confirm eligibility and for validation. The fully executed signed contract must be posted in the contract repository for financial verification prior to TCV Achievement Bonus and Commission Pool calculation or payment.

### To receive credit for a Sales Executive's Qualified Submitted Proposal Quota Bonus

Once a New Logo opportunity is approved at the Deal Review 2 (DR2) stage of the deal review process, and meets the minimum TCV threshold of 500k USD, a Sales Executive is eligible to receive credit attainment towards their Qualified Submitted Proposal quota. Only those proposals that are New Logo business type, and are submitted to the Client will qualify. Upon DR2 approval, the Sales Executive must submit a SCCF and choose the checkbox that applies to Qualified Submitted Proposals. Qualified Submitted Proposal Quota credit can only be claimed by the Opportunity Owner, and cannot be shared with another opportunity team member.

## TCV BONUS CALCULATIONS

The amount of TCV Achievement Bonus quota credit for an eligible transaction is calculated by:



Note: **New Scope** opportunities do not qualify. Under special circumstances, the Sales Executive must obtain and document explicit approval from leadership before engaging in the pursuit of a New Scope opportunity. Only fully validated and approved New Logo opportunities will be eligible for Quota credit or Commission Pool.

The following incentive schedule applies to the Participant's full year TCV achievement against the assigned quota as mentioned on the Plan Assignment in Workday.



## Sales Executives – Payment Curve for TCV Achievement Bonus





## ACHIEVEMENT

| Attainment level | Incentive Earning |
|---|---|
| 10% | 10% |
| 90% | 90% |
| 100% | 100% |
| 105% | 115% |
| 110% | 130% |
| 115% | 145% |
| 120% | 160% |

10% + 1x for every 1% achieved 10% - 100%

100% + 3x for every 1% achieved 100% - 120%

| | |
|---|---|
| 125% | 180% |
| 130% | 200% |
| 135% | 220% |
| 140% | 240% |
| 150% | 250% |
| 155% | 255% |
| 160% | 260% |

160% + 4x for every 1% achieved 120% - 140%

240% + 1x for every 1% achieved >140%; No Caps

For 2021, quota achievement will consider attainment from January 1, 2021 to December 31, 2021.  An attainment level up to 100% will result in a proportionate Incentive payment of TCV Target Incentive. For achievement between 100% and 120%, the Incentive earning will be 100% plus 3x for every 1% of achievement. For achievement between 120% and 140%, the Incentive earning will be 160% plus 4x for every 1% of achievement. For an attainment level above 140%, each additional point of attainment will increase incentive payment by 1 point, over 240%. No payment caps apply on overachievements.

TCV Achievement Bonus earnings are independent of Commission Pool.

**UNISYS** | Securing Your Tomorrow®

## OVERACHIEVEMENT REQUIRING APPROVAL

Accelerated Incentive payments for attainments greater than 100% achievement on TCV will be reviewed by Leadership and discretion may be applied to adjust the payment, particularly in cases where the overachievement is largely due to a misaligned quota.

## BONUS CALCULATION FOR QUALIFIED, SUBMITTED PROPOSALS

For Qualified, submitted proposals, Bonus will be calculated linearly and proportionate to % of quota achieved. No payment caps apply on overachievements.

## INCENTIVE PAYMENT

Quarterly Achievement Bonuses are payable at the end of each quarter in the next available pay period after validation and calculation of fully approved Sales Credit Claim Forms. Accelerated payments from overachievement on quotas are paid at year end.

## RESOURCES

### Plan Document
The Unisys 2021 Sales Executive Sales Compensation Plan – Part 1 (the "Plan") is made up of three parts, all available on the Sales Center:

- Part 1: Role-specific Plan information (this document) communicates the details of your sales compensation plan and serves as an easy reference tool for the duration of the plan period. It contains information about the design and key components of the plan.

- Part 2: Legal Terms and Provisions, including topics of account assignments, changes in eligibility, dispute resolution procedures and a glossary of terms.

- Part 3: Country-specific addendum outlines changes to provisions of this Plan to comply with local country laws or regulations.

### Quota Assignment
Quota assignments are available in Workday.  To indicate acceptance of  assigned quota and this Plan, Participants must select "I Agree" in Workday and click Submit.  Acceptance should be completed promptly upon notice that a Participant's Plan and quota are available in Workday.  No Achievement Bonus payment will be calculated or advanced until the Plan and quota is accepted in Workday.

### Additional Sales Comp Materials
The Sales Compensation site is the repository for incentive documents, frequently asked questions and overview/training materials. This site can be accessed via the Go-To-Market Portal or the Human Resource Global Rewards SharePoint site.  Any questions regarding the sales compensation plan, targets or quotas, or this document should be directed to **leadership**.



# 2021 Sales Compensation Plan, Legal Terms and Provisions - Part 2

The 2021 Sales Compensation Plan, Legal Terms and Provisions (the "Plan"), is applicable to all Unisys Business Units/Organizations, and includes provisions, terms and conditions, as well as the dispute resolution procedure, applicable to all Plan Participants, hereafter referred to as Participants. The contents of this document are a continuance of, and are incorporated by, reference into Part 1 of all Unisys Sales Compensation Plans and to any country-specific addenda. If any provision of the Plan conflicts with mandatory provisions of applicable local laws and/or collective bargaining agreements, such provision of the Plan shall be deemed to have been modified but only to the extent necessary to avoid such conflict and, where possible, retain the original intent of the provision of the Plan.  Appropriate modification to the Plan will be identified in a country-specific addendum, as required.

## Contents

Section 1:      Applicability
Section 2:      General Terms and Conditions
Section 3:      Change to Eligibility Status
Section 4:      Eligible Transactions – Quota/Client Assignments
Section5:       Ethical Commitments, Disclosures and Delegation of Management Authority
Section 6:      Plan Exception Process
Section 7:      Dispute Resolution Procedure
Section 8:      Definitions
Section 9:      Annual Financial Plan (AFP) Rates

## 1.  Applicability:

This Plan, Part 2 applies to Plan provisions from January 1, 2021 through December 31, 2021, unless otherwise specified, for the following Sales Compensation Plans, Part 1:

**Participating Plans**
- Sales Executive;
- Business Development;
- Client Management;
- ClearPath Forward Client Management;
- Specialty Sales;
- Pursuit Team;
- Commissions Pool

The term "Participant" applies to Participants in any plan Part 1 noted above.  Reference to "the Company" is to Unisys Corporation and/or the applicable local subsidiary of Unisys employing the Participant.

**UNISYS** | Securing Your Tomorrow®

## 2. General Terms and Conditions

These terms apply to the fullest extent permitted by applicable law and/or collective bargaining agreements.

- Because business circumstances can change, the Company reserves the right in its sole discretion to adjust, modify or change the Plan (including each Part 1), in whole or in part, during or after the close of the fiscal year, including, but not limited to, making such adjustment, modification or change, for the purpose of addressing administrative errors, unanticipated circumstances, inaccurate quotas and/or for the purpose of addressing payments or potential payments which are either beyond those reasonably contemplated by the Company or that fail to reflect a reasonable valuation of the Participant's contribution toward a transaction or group of transactions. On the same basis, the Company retains sole discretion to modify individualized sales credits, commission/bonus rates, commissions/bonuses, quotas, funding formulas, or any other applicable terms and provisions, which may result in a decrease or an increase in compensation. A new individualized Plan need not be issued to the Participant in order for any such modifications under the plan to be binding on the Participant, so long as written notice is provided to the Participant(s) for material modifications.
- All commission/bonus calculations are predicated upon the current 2021 Business Offerings Library, as incorporated by reference into this Plan, as amended from time to time at the sole discretion of management. To the extent, the value of any sale, order, contract, or transaction reflects a Corporate Gross Margin less than that assumed in the 2021 Price Book, commissions/bonuses calculated on commission-eligible transactions may be adjusted accordingly at the sole discretion of management.
- The Company maintains sole discretion to make any and all financial calculations necessary for the administration of this Plan. It also maintains sole discretion in the calculation of any incentive compensation based upon applicable Unisys policies and procedures.
- Target Incentive / Bonus is calculated using the salary and pay mix as of January 1st of the current year, and will not be revised based on base salary increases during the year.
- In the event a special agreement is made with a client, such as extraordinary pricing, extraordinary terms and conditions or extraordinary support commitments, management will determine, in writing, the extent to which the Participant may earn commissions/bonuses or sales compensation, if any. A special agreement is any agreement not covered by the Unisys Price Book.
- Order and revenue recognition are determined by Corporate Financial policies that comprise the Booking Rules. These policies are found in the Revenue Recognition, TCV, and Backlog Policy (UFM 3.1) document and incorporated by reference, which take precedence over any provision of this Plan that is inconsistent with these rules.
- Nothing in this Plan in any way diminishes or limits the Company's right to terminate the employment of any Participant, at will, at any time, at its sole discretion, with or without notice. All employees of the Company are employed in an "at will" capacity, which means that either the employee or the Company may terminate the relationship at any time, with the understanding that neither party has the obligation to base that decision on any reason other than their intent not to continue the employment relationship.
- The provisions contained in this Plan for any year do not, in any way, commit the Company to pay a similar kind of compensation in any subsequent year.
- All components of the Plan, including accompanying forms, and any updates, revisions, clarifications and/or other modifications made by Unisys are proprietary and may not be altered or modified in any way unless authorized in writing by Unisys.



- No one eligible to participate in this Plan may be concurrently eligible to participate in any other commission or incentive compensation plan, unless specifically approved in writing by the appropriate Business Unit/Organization President and SVP Human Resources.

## 2a. Delinquencies/Cancellation/Charge Backs

Participants are deemed to fully earn their commissions/bonuses only when clients are considered in good standing and when full payment is made by the client.  Incentive payments can be withheld and chargebacks can be applied until the commission/incentives are fully earned.

- Any client invoice that is not collected in full within ninety (90) days of the invoice date will be classified "delinquent/in default." Management has the right to withhold any current/future advances of commissions in reserve or incentives unless and until the delinquency/in default is rectified.  If or when the client rectifies the delinquency/in default, the Participant will receive the withheld commission or incentive payment provided they are still eligible under this plan and the other applicable provisions of this plan have been met.

- Previously advanced commissions/bonuses, commissions in reserve or incentives will be subject to charge back to the extent the proportion of advances exceeds the corresponding proportion of client payments to date.

- If the client cancels, the contract in whole or in part then the chargeback may be proportionate to the cancellation. Cancellations will be applied in the quarter or month they occur.

- Negative balances will carry forward and be offset against future advances, earned incentives, or earned commissions/bonuses.

## 3. Changes to Eligibility Status

A Participant ceases to be covered by this Plan starting the day following their last day worked for any reason with Unisys.

For the purposes of this Plan and except as specified in a country-specific addendum, the Participant's last day of work is the last day on which assigned work duties were actually performed by the Participant as determined by their management, and specifically excludes all periods of pay in lieu of notice, income assistance or any other post-termination benefit or post-termination compensation period. The Company determines the applicability of this provision at its sole discretion.

When a Participant ceases to be covered by this Plan, all papers, files, correspondence and records of all prospects, clients and all other Unisys or client documents, electronic, hard copy or otherwise, in Participant's possession or control relating to the business conducted by the Company must be immediately delivered to Participant's immediate leader. The Company may withhold final settlement of the Participant base salary, vacation pay, commissions/bonuses or other wages due, to the extent permitted by applicable law, until this condition is fulfilled in total.

Any Participant who voluntarily or involuntarily terminates his or her employment with the Company, on or before the last day of the commission earned period and/or December 31, 2021, for any reason other than divestiture of his or her business unit or department, shall,



effective as of the Participant's last day of work, have no rights or entitlements under the 2021 Plan, except as may be provided by a local addendum or local law.

Any Participant, who is involuntarily terminated due to divestiture of his or her business unit or department, may be eligible for a payment for the applicable period, subject to the discretion and approval of the Direct Report to the CEO and the applicable VP, Human Resources.

**For Participants on this Plan who are eligible for commissions, the following rules will apply (**including but not limited to, Sales Executive Plan Participants, Specialty Sales Plan Participants, Business Development Plan Participants, Client Management Plan Participants, ClearPath Forward Client Management Plan Participants and Pursuit Team Plan Participants**):**

- For contracts that have not been fully executed by Unisys as of the last day worked, no commission or bonus is calculated, advanced, or earned.
- Commission advances in reserve are not considered earned or eligible to be advanced unless the advance date is on or prior to the Participant's **last day of work** and the client is current and/or not delinquent or in default with payment.

**For Participants on this Plan who are eligible for bonuses, the following rules will apply** (including, but not limited to, Client Management Plan Participants, Pursuit Plan Participants, ClearPath Forward Client Management Plan Participants and Specialty Sales Plan Participants)**:**

- In order to be considered eligible for any Bonus, the last business day of the applicable Bonus Period, must be on or before the Participant's last day worked.
- Bonuses will be paid only to Participants who are on an eligible Plan for at least 60 days or two full calendar months of the Bonus Period. If a Participant transfers, and the period of time they were on an eligible Plan is less than 60 days, the Participant will not be eligible for a Bonus for that Bonus Period.
- If the Participant's last day of work is prior to the last day of the Bonus Period, the Participant will not be eligible for a Bonus and all Bonus amounts contributed to a discretionary Bonus pool by a terminated Participant not meeting the above eligibility requirements will be debited from the pool.

After a Participant's last day of work there is a 60-day reconciliation period for processing commission activity. At the end of that reconciliation period, any commission/bonus advances or **earned commissions/bonuses** due to the Participant will be released to him/her less any amounts owed to Unisys.

If a terminating Participant shows a negative commission/bonus balance as of the last day of work, or if in the opinion of their immediate leader there is a substantial likelihood that such a liability will materialize after the last day, the Company, to the extent permitted by applicable law, is authorized to:

- Retain the amount of the commission/bonus debit by extracting an amount equal to the negative balance or liability; and/or
- Withhold the offset amount by reducing the Participant's base salary, vacation pay, commissions/bonuses or other wages due to the employee upon separation from the Company.

If, after reconciliation, any retained commission/bonus is to be released after the 60-day period, local management must notify the GTM Compensation Operations in writing.



**Changes to Positions, Transfers and Promotions**

When a Participant transfers to another position within Unisys that ends participation in the then current Plan, the following rules apply:

- Commissions/Bonuses advanced before the effective transfer out date are considered earned.
- If eligible for commissions, the Participant is entitled to commissions for eligible transactions prior to the transfer out date that would have otherwise been advanced under normal timing before the Participant's transfer.
- If not all commission reserves have been released prior to the transfer out date, the Participant's leader will determine if the original Participant of record will receive the commission reserves or if a newly assigned Participant should be eligible for the reserve commissions.
- Leadership has the right, in its sole discretion, to reallocate all or a portion of the reserves to the new Participant who will now be responsible for enhancing the relationship with the client. This should be submitted for approval under the Exception Process. In either case, the reserves will be released upon the original scheduled release date.
- A prorated share of compensation may be available for a participant who has a change in position, transfers or is promoted during the 2021 plan year but continues with the Company. Commissions/Bonuses are based on performance against assigned goals for a Participant in the Plan. The resulting commission/bonus amount is prorated for the official time spent in a Plan covered position. To be eligible for proration, the Participant must have spent at least two months in that position. The Participant will receive a new plan, with goals and incentive targets that are prorated according to the time remaining in the year.
- At leadership's sole discretion, an exception to these proration rules may apply in situations where it is no longer possible to track the annual performance of a Business Unit/Organization. In those situations, the Participant may be "cashed out," meaning the annual goals will be prorated by their time in the position and then measured against year-to-date performance to determine achievement levels. The appropriate annual incentive at that achievement level is then prorated by time in the position.
- For Plans with overachievement commission/bonus opportunity, there is not a prorated share of compensation calculated for overachievement earnings.

The role that appears on the participant's Workday Sales Plan document will reflect the role that the associate held as of the effective date of the Sales Plan Issuance, and will not take into account any change in role after the effective date.

**Draw Arrangements: Only applicable to Sales Executive Plan Participants** (all other Plan Participants are not eligible for Draws)

Any draw agreement for a Participant must be in writing and must be provided to GTM Compensation Operations for payment.

- Before payment of the first draw installment, in order to be eligible for the payment, the Participant must accept the applicable Sales Compensation Plan in Workday.  It is the responsibility of Sales Leadership to initiate the assignment of the Plan and the responsibility of the Participant to accept the plan in Workday.
- The draw term begins with the first month a draw is initiated and ends following the last month a draw is provided. During this draw term, normal commission advances are calculated, but not released.  At the end of the draw term, the total amount drawn by the



Participant is reconciled against the commissions calculated or advanced during that period.

## 4. Eligible Transactions – Quota/Client Assignments

The Participant's scope of activity and operation is limited to the Clients assigned in writing and/or in Salesforce.com, Oracle Project Accounting or the Unisys system of record by Participant's immediate leader. Within each operation, Clients may be assigned at the sole discretion of the Company and may be referenced by vertical industry, geographic territory, and product line or on an individual client basis.

**Eligible Transactions**

In accordance with sales operations business practices, Sales Credit or Bonus credit is given based upon client assignment and/or territory mapping. A Participant is eligible for Sales Credit or Bonus credit only for clients and territories listed under Participant's name on the approved local territory mapping and/or client listing (which may be modified from time-to-time).

- A Participant receives sales credit, calculation and payment advance only for eligible transactions specified in the Compensation Plan - Part 1.

- In order to receive sales credit, it is the responsibility of the Participant to ensure they have met all requirements of transaction eligibility specified in the applicable Compensation Plan – Part 1 including the timely submission of Sales Credit Claim Forms (SCCF) where required.  SCCF must be completed, fully approved and submitted within 30 days of closing the opportunity in Salesforce.

- To the fullest extent permitted by applicable law, order cancellations and other similar adverse client actions relating to a prior commitment will be taken into account in the decision to award, reduce or not award potential future payments under this Plan until the reserves are released.

If the conversion of sales credit or bonus credit into US Dollars is needed, the conversion to US Dollars uses the Annual Financial Plan Rate.  In the situation in which business is booked in a currency other than the Participant's local currency, the sales credit value will be converted to the Participant's local currency using the Unisys current monthly Exchange Rate, then to US Dollars using the Annual Financial Plan Rate. **The Annual Financial Plan Rate for 2021 uses the January 2021 exchange rates listed below in Section 9, and are posted to the Sales Compensation site.**

**Sales Credit Claims**

All Sales Credit requests must be submitted using the Sales Credit Claim Form available in the Salesforce Opportunity record.
- The form must be completed, approved and part of the Salesforce Opportunity record.  Approval must be gained before final submission.
- SCCF must be completed, fully approved and submitted within 30 days of closing the opportunity in Salesforce.
- In case of split commission payments, the commission percentage will be determined at the sole discretion of management, for each Participant.

**Quota/Client Assignment – Quota Definitions**

Leadership will assign Participants a quota, which will define the level of expected performance achievement.



- Quota definitions are based on a consistent methodology as approved by VP of Corporate Business Operations and the Finance organization. Non-standard or custom quota definitions are not allowed without documented approval by VP of Operations & Planning.
- Quota assignments are based on leadership's expectations for performance within assigned client(s) and/or territories.
- Quota amounts may only be changed during the plan year at the sole discretion of leadership.
- Quotas are established on an annual basis. If the Participant is entering the position for less than a full year, the quota may be prorated by leadership based upon the time the Participant is in the role.
- A Participant is not eligible for any commissions prior to the hire date or plan effective date.
- Constant currency quotas are assigned using USD. If a conversion of quota into US Dollars is needed, the conversion to US Dollars uses the **Annual Financial Plan Rate**.
- In a situation where multiple Participants support a client or territory, each Participant will only be eligible to receive sales credit equal to the products and/or services within the assigned quota definition, and incentive calculations will be made according to each Participant's Plan.

**Changes in Client Assignment**

A Participant who has a change to client or territory assignment may be reassigned a new quota effective as of with the assignment change date.

- The original quota and target incentive may be noted with an end date in Workday effective the last day of the former client or territory assignment.
- Leadership may assign a new quota and the target incentive, if applicable to the Participant's Plan, may be pro-rated to reflect time with the new assignment.
- Any future advances for the new assignment will not be made until the Participant accepts the new Plan in Workday.
- Bonus-based Plan Participants (including, but not limited to, Client Management Plan Participants, Pursuit Plan Participants, ClearPath Forward Client Management Plan Participants and Specialty Sales Plan Participants): Any changes to incentives resulting from cancellations or delinquencies will apply to the Participants assigned to the particular account at the time of that respective transaction.
- The newly assigned Participants assume all activity associated with the newly assigned account(s) as well as any associated compensation while he/she is assigned to the specified account(s).

## 5. Ethical Commitments, Disclosures and Delegation of Management Authority

Eligibility for participation and receipt of compensation under this Plan requires strict compliance with the **Unisys Code of Ethics and Business Conduct**. Non-compliance, as determined by Unisys in its sole discretion, will constitute grounds for cancellation of compensation eligibility and include other disciplinary action up to and including discharge from employment. The company may also request that any past payments under this Plan or a previous sales compensation plan that are in any way connected to a Participants unethical conduct, to the extent permitted by applicable law, be returned to the Company;

- The Participant is responsible to disclose, in writing, to Management, all commitments and representations made to the client, but not contained in the contract signed by the parties, regardless of whether these commitments were written or verbal.
- Failure to disclose commitments may result in credit and/or commission reduction or disallowance, at the sole discretion of Management.
- Eligibility for participation and receipt of compensation under this Plan requires compliance with Unisys Delegation of Management Authority. In order to be eligible for



commissions, a sales contract must have first obtained appropriate approval in accordance with the Delegation of Management Authority policy, available at DOA .

## 6. Plan Exception Process

Any request for exceptions to this Plan must be sent in writing to the Participant's immediate leader. Under the Unisys Delegation of Management Authority, the Business Unit Leader and VP Corporate Business Operations or designees must approve exceptions.   All exception or adjustment requests must be submitted within 60 days following fiscal year end. After this period, exceptions or adjustments will not be considered for commissions/bonuses.

BU Leaders may approve requests for account target changes or quota relief if they are in the best interest of the BU and will not negatively impact the overall goal of the region meeting its operating plan commitments.

## 7.  Dispute Resolution Procedure

The procedures outlined below are designed to provide for a prompt and thorough review of all disputes concerning the crediting, advancing, debiting, payment or charge-back of all items of commission or incentive compensation included in this Plan. The disputing party and the Company agree they will use and exhaust these procedures first in an effort to resolve any dispute covered by this Plan, before resorting to any other tribunal, court or administrative agency.

- The disputing party and the Company agree this procedure is mandatory and a prerequisite to any other remedy available concerning the recovery of commission or incentive compensation provided for by this Plan. Only after the exhaustion of the procedures outlined here may either party pursue any further relief.
- Further, any initial inquiry, as described below, invoking this dispute resolution procedure must be submitted in writing within six (6) months of the date of any commission/incentive-eligible business transaction in dispute. Failure to file an initial inquiry within this time frame will constitute a waiver of complaint by the Participant.

### A. Initial Inquiry to your leader

After complying with the documentation requirements, a written notice, with documents supporting the Participant's position, must be completed and sent to the first-level leader explaining the reasons for contesting the GTM Compensation Operations Department's determination.

The first-level leader either confirms the determination of the GTM Compensation Operations Department or sends a memo to the GTM  Compensation Operations with a copy to the appropriate Business Unit/Organization Human Resources Director stating clearly, why he/she disagrees with its original determination. The GTM Compensation Operations Department either confirms its original determination or makes a re-determination based upon the facts then available, in writing, to the first-level manager.

### B. Second Inquiry to your second-level leader and HR

If the Participant or the first-level leader does not agree with the determination of the GTM Compensation Operations, the Participant must submit a written notice outlining the basis of the dispute within one (1) month of the outcome of the Initial Inquiry, including pertinent documentation, to the second-level leader and the appropriate Business Unit/Organization Human Resources Vice President for review. After reviewing the specifics of the issue, the



second-level leader and the Human Resources Vice President will determine whether to grant the appeal.

If your second-level leader and Human Resources Vice President grant the appeal, they will pursue resolution by securing any additional documentation and approvals and requesting payment through the GTM Compensation Operations. If they deny the appeal, they will provide written notification of the basis for their determination to the Participant and the GTM Compensation Operations.

### C. Third Inquiry to your third-level leader, HR and Associate General Counsel

In the event of continued disagreement, the Participant or the second-level leader may file a written request for a full review by the third-level leader, and the appropriate Human Resources Vice President, or designee, and a member of the Law Department within one (1) month of the outcome of the Second Inquiry. The written request must contain documentation indicating compliance with the initial step(s) of the Dispute Resolution Procedure. The third-level leader, the Human Resources Vice President, or designee, and the Law Department will respond to the final inquiry, in writing, and this determination is the final determination of the Company regarding any dispute under this Plan.

### D. Final decision via arbitration or applicable form

*The following is applicable in the U.S. only. Outside the U.S., each country determines the applicable form of arbitration in accordance with the law, and as described in country-specific Addenda.*

- If agreement cannot be reached through the dispute resolution procedures outlined here, the parties agree to settle exclusively by confidential arbitration under the U.S. Arbitration Act and the current Commercial Arbitration Rules of the American Arbitration Association (AAA), according to the terms of this Agreement and the law of the Commonwealth of Pennsylvania.

- To begin the proceedings, the initiating party must send the other party written notice by registered mail at least sixty (60) days before starting arbitration. Notice to Unisys should be addressed to its Associate General Counsel, Unisys Corporation, 801 Lakeview Drive, Suite 100, Blue Bell, PA 19422-0001.

- One arbitrator, selected by the AAA, who is an attorney from its panel, will conduct the arbitration. The arbitrator is limited to the express terms of this Plan when awarding damages and has no authority to award punitive damages or any other form of non-compensatory damages. Judgment upon the arbitrator's award may be entered and enforced in any court of competent jurisdiction.

- Neither party will be precluded from seeking a judgment in the court of any jurisdiction to protect its rights and interests, but a court case should not be sought as a means to avoid, delay or stop arbitration.

**UNISYS** | Securing Your Tomorrow®

## 8. Definitions

### Business Type Definitions

**New Logo**
- A new client which has not previously done business with Unisys and signs a new MSA
- A new MSA for a separate buying entity when part of an existing customer overarching organization
- A client that has not done business (been invoiced) in previous, consecutive 12-month period.
- Public Sector Accounts – a new agency that has not done business with Unisys
- A New Logo Beachhead opportunity, which leads to a larger opportunity within 12 months, will be treated as New Scope for the purposes of sales compensation and commissions.

**New Scope**
- Existing Client adds business in a New Services Line

**Expansion**
- Business at an existing client that represents an increase of scope (volume of seats, licenses) in a different geography.
- Existing Client adds business in an Existing Service Line
- Extension existing work done at that client

**Renewal**
- The continuing or extension of existing business under an existing contract.
- A Competitive Renewal is continuing or extension of existing business due to an RFP where the opportunity has been opened to competitive bid/RFP.

### Additional Definitions

**Annual Financial Plan Rate**
The Annual Financial Plan (AFP) rate is used as the currency exchange rate to convert order values from local currency to USD for attainment recognition only and then to convert the calculated commission value to the individual's local currency for payment.  This is the approved annual fixed rate as provided by Corporate Finance.

**Booking Rules**
Booking policies are located under Policies and Practices/Corporate Policies and Practices from Inside Unisys, i.e. Unisys Financial Manual – see Revenue Recognition, TCV, and Backlog Policy section.

**Earned Commission**
An amount of compensation that the Company calculates and credits to the eligible Participant based on the Company booking rules for a qualifying commission eligible transaction. The determination of whether a payment is earned under this Plan will require a review of the terms of the applicable Plan, the Company's applicable rules for booking and recognizing revenue credit as well as whether the Company is receiving payment from the client and the timing of such payments, among other factors.  These considerations may result in a finding that a payment has not been earned under the Plan.



**Commissions Reserve**
The remaining value of the total calculated commission amount once the initial commission advance is made.  All 2nd and subsequent amounts are held in reserve and released according to the terms of the Plan including, for example, triggers based on the total commission value, financial performance of the engagement or dependent upon contract length.

**Compensation Plan, Part 1**
The part of the Sales Compensation Plan specific to the Role.

**Compensation Plan, Part 2**
The part of the Sales Compensation Plan containing Terms and Conditions and other common provisions across all Unisys compensation plans.

**Draws**
Management may elect to pay a Sales Executive a fixed monthly amount, referred to as a draw, for a term up to a maximum of three months (for non-recoverable draws) or six months (for recoverable draws).  Only GTM Compensation Operations is authorized to provide draw payments.  Any draw agreement between Human Resources and Sales must be in writing and must be provided to GTM Compensation Operations for payment.  The Sales Executive must accept the applicable Sales Compensation Plan in Workday in order to be eligible to receive installments of the draw.   It is the responsibility of the Sales Executive's leader to assign the plan and the responsibility of the Sales Executive to accept their plan in Workday.

**Earning Commissions/ Receiving Advances**
Provided the other applicable provisions of this plan are also met, Unisys follows a practice that provides for Participants to earn commissions in line with clients demonstrating satisfaction by not being delinquent/in default.  Therefore, Participants do not earn their commissions until the client makes full payment.  However, Participants will be advanced commissions against credits that have been applied to their sales quotas.  If a client fails to make full payment, then the Participant does not earn full commission under this plan (see Full Payment).

**Eligible Transaction**
A contract/transaction which meets the requirements of the applicable Plan for the defined Sales plan and position.

**Extension of Existing Contract**
Typically associated with the exercising of an option year.

**Full Payment**
Provided the other applicable provisions of this plan are also met, at the time for making final payment of earned commissions to a Participant, clients who are current with making payments against invoices and who are not delinquent or in default are considered as making full payment under a contract.  If a client makes less than full payment, then commissions/advances are subject to the charge back provisions of this plan. (See Delinquencies/Chargeback Section)

**Last Day of Work**
The last day on which assigned work duties were actually performed as determined by their leader, and specifically excludes all periods of pay in lieu of notice, income assistance or any other post-termination benefit or compensation period.



**Negative Commission Balance**
Where commission advances and/or payments exceed commission earnings, a negative, or debit balance results, e.g. in the case of order cancellations or charge backs.

**Non-Commission-Eligible Business**
The following types of business **DO NOT QUALIFY** for commissions:

- Non contracted Break and Fix - Time and Material
- Evergreen (month to month) TSS contracts
- Temporary Rentals (less than 12 months)
- Letters of Intent
- Supplies
- Matching Grants
- Scheduling Orders
- Transportation Charges
- Donations
- Interest/Finance Charges
- Loan Equipment
- Mechanical replacement
- Spare Parts
- Eco-tax charges
- Recycle charges
- Taxes
- Internal Use Equipment Orders
- Client/ Expenses – travel, entertainment, etc.
  Products or services provided to Unisys subsidiaries

**Operating Plan**
Financial estimates that project the next year's financial attainment.  This is used during the plan year to compare against actual attainment.

**Opportunity ID**
SFDC Opportunity ID number is the unique identifier for an opportunity record. The SFDC ID must be included on all TCV transactions to be eligible for commissions or SPIFF payments.

**Plan and Quota Acceptance**
The participant's acknowledgement, using Workday, of the assigned Quota and Target Incentive assigned by his/her leader.

**Qualified Submitted Proposal**
An opportunity that is approved at the DR2 stage, is ≥ 500k USD, and is submitted as a proposal to the client.

**Quota Achievement**
Includes values credited to the Participant for eligible transactions or assigned client / territory results under their plan.

**Sales Contract ("Sale")**
A contract for products or services (excluding any lease) where the client agrees to pay the total or agreed upon purchase price when billed.



**Sales Credit Claim Form (SCCF)**
Sales credit, commissions pool and/or SPIFF requests are registered by completing the Sales Credit Claim Form (SCCF), which is available in the Opportunity record in Salesforce.  Data population, along with workflow approvals, are done via Salesforce.  Manual templates or email approvals are not accepted.  One SCCF per opportunity should be initiated once the opportunity is won and a fully executed signed contract is complete, the Opportunity record and SCCF are updated to reflect final contract values by Service / Product line.  The fully executed signed contract and associated financial documentation must be posted in the contract repository and Salesforce opportunity record for verification prior to commission calculation or payment.  Final approval of the SCCF, once secured, is forwarded automatically to ~GTM Compensation Operations for eligibility and financial validation.

**Target Incentive / Bonus**
The amount of compensation that can be earned for 100% achievement of the assigned quota and any personal objectives. Target Incentive is calculated using the salary and pay mix as of January 1st of the current year, and will not be revised based on base salary increases during the year.

**Targeted Strategic or Competitive Renewal**
For a plan Participant to be eligible for a Commission Pool, the renewal must be identified and pre-approved by Region Level P&L owner and VP of Operations & Planning.

**TCV Value**
The total committed contract value as recorded in the Company's order entry systems.  The value added to the Participant's workbook as credit toward quota or deemed eligible for Commissions Pool.  A Sales Credit Claim Form must be completed for any TCV credit or payment.

## 9.  Annual Financial Plan (AFP) Rates based on January 2021 rates

| Currency ID | Country | Currency Name | 1-Jan-21 |
|---|---|---|---|
| ARS | Argentina | Argentine Peso | 0.01188410000 |
| AUD | Australia | Australian Dollar | 0.76940000000 |
| EUR | Austria | Euro | 1.22165000000 |
| EUR | Belgium | Euro | 1.22165000000 |
| BOB | Bolivia | Boliviano | 0.14523700000 |
| BWP | Botswana | Pula | 0.09245000000 |
| BRL | Brazil | Brazilian Real | 0.19243000000 |
| BGN | Bulgaria | Bulgarian Lev | 0.62457100000 |
| CAD | Canada | Canadian Dollar | 0.78582400000 |
| CRC | Central America | Costa Rican Colon | 0.00163083000 |
| NIC | Central America | Cordoba | 0.02882110000 |
| CLP | Chile | Chilean Peso | 0.00140746000 |
| CNY | China | Yuan Renminbi | 0.15323300000 |
| COP | Colombia | Colombian Peso | 0.00029133300 |
| CYP | Cyprus | Cyprus Pound | 2.08703000000 |
| CZK | Czech Republic | Czech Koruna | 0.04675740000 |
| DKK | Denmark | Danish Krone | 0.16415600000 |



| ECS | Ecuador | Sucre | 0.00004000000 |
|---|---|---|---|
| SVC | El Salvador | El Salvador Color | 0.11428600000 |
| EUR | Europe | Euro | 1.22165000000 |
| XEU | Europe | European Currency Unit (E.C.U.) | 1.22165000000 |
| EUR | Finland | Euro | 1.22165000000 |
| EUR | France | Euro | 1.22165000000 |
| EUR | Germany | Euro | 1.22165000000 |
| EUR | Greece | Euro | 1.22165000000 |
| GTQ | Guatemala | Quetzal | 0.12834900000 |
| HNL | Honduras | Lempira | 0.04157310000 |
| HKD | Hong Kong | Hong Kong Dollar | 0.12898100000 |
| HUF | Hungary Kft | Forint | 0.00336774000 |
| INR | India | Indian Rupee | 0.01364556200 |
| IDR | Indonesia | Rupiah | 0.00007117440 |
| EUR | Ireland | Euro | 1.22165000000 |
| ILS | Israel | Shekel | 0.31126000000 |
| EUR | Italy | Euro | 1.22165000000 |
| JPY | Japan | Yen | 0.00968570000 |
| KES | Kenya | Kenyan Shilling | 0.00915374000 |
| KRW | Korea | Won | 0.00092037800 |
| MYR | Malaysia | Malaysian Ringgit | 0.24874100000 |
| MXP | Mexico | Mexican Peso | 0.05021520000 |
| NAD | Namibia | Namibia Dollar | 0.06805150000 |
| EUR | Netherlands | Euro | 1.22165000000 |
| NZD | New Zealand | New Zealand Dollar | 0.71845000000 |
| NOK | Norway | Norwegian Krone | 0.11656200000 |
| PKR | Pakistan | Pakistan Rupee | 0.00624263000 |
| PEN | Peru | Nuevo Sol | 0.27616680500 |
| PHP | Philippines | Philippine Peso | 0.02082030000 |
| PLZ | Poland | Zloty | 0.26786000000 |
| EUR | Portugal | Euro | 1.22165000000 |
| RON | Romania | Romanian New Leu | 0.25138300000 |
| RUR | Russia | Russian Ruble | 0.01350680000 |
| SAR | Saudi Arabia | Saudi Riyal | 0.26653900000 |
| SGD | Singapore | Singapore Dollar | 0.75637200000 |
| EUR | Slovak Republic | Euro | 1.22165000000 |
| ZAR | South Africa | Rand | 0.06805150000 |
| EUR | Spain | Euro | 1.22165000000 |
| LKR | Sri Lanka | Sri Lanka Rupee | 0.00539214000 |
| SZL | Swaziland | Lilangeni | 0.06805150000 |
| SEK | Sweden | Swedish Krona | 0.12154700000 |
| CHF | Switzerland | Swiss Franc | 1.12962000000 |
| TWD | Taiwan | New Taiwan Dollar | 0.03559480000 |
| THB | Thailand | Baht | 0.03337900000 |

**UNISYS** | Securing Your Tomorrow®

| TRY | Turkey | New Turkish Lira | 0.13440100000 |
| GBP | U.K. | Pound Sterling | 1.36700000000 |
| AED | UAE | UAE Dirham | 0.27225700000 |
| UYP | Uruguay | Uruguayan Peso | 0.02361832800 |
| VEF | Venezuela | Bolivares Fuertes | 0.00000402831 |
| VES | Venezuela | Bolivares Fuertes | 0.00000091937 |
| VND | Vietnam | Dong | 0.00004329290 |

**Unisys Confidential**